11-2334 Madison Miracle Productions v. MGM Distribution Company Good morning, your honors. I'm Marty Katz from Shepard Mullen on behalf of MGM Distribution Company. May it please the court, we are here because this case, the trial court, the circuit court found jurisdiction but predicated its finding of jurisdiction on specific jurisdiction, not general jurisdiction, which means that there are three prongs to the jurisdictional test, the traditional minimum contacts and fair play and substantial justice, but also in the context of specific jurisdiction, plaintiffs were required to prove a third prong, namely that their claim arose from the purported minimum contacts. And I want to start with that last prong, the arising from or related to prong, whether the claims in this case arise from the purported minimum contacts. It is, of course, MGM Distribution's position that there were no minimum contacts, let alone minimum contacts with Illinois. But in terms of focusing upon what the claim arises from or relates to, the court really need look no further than the second amended complaint that was filed by the plaintiffs, which is summarized in our opening brief on pages 6 and 7. But what it sets forth is what the claim is all about. The claim is that MGM Distribution didn't do a great job distributing the film entitled Madison, but didn't do so because it purportedly rejected Madison's media plan, removed the MGM logo and artwork from the film or directed Madison to do so, booked it at theaters at the last minute, didn't retain sufficient employees when it engaged in a transaction with Sony Pictures Entertainment in California, and failed to take place. And that was California, where both the decisions were made by MGM Distribution and where its distribution activities take place. It taps into a network of third party theater owners, exhibitors they're called, that own theaters around the country. And those sales of the rights to exhibit the picture take place from MGM Distribution's offices in California. And if asked under the agreement to support the marketing effort and the marketing plan that was Madison's plan, then MGM Distribution would do so, and did do so by interfacing with Madison's media specialists, Stephan Manperl and Motive Entertainment, both located in California. And as a result, whether there are any contacts or minimum contacts with Illinois, the claim in this case, the alleged breach in this case, arises not from those contacts, but from decisions made in California and distribution activities conducted in California. And therefore, the circuit court erred when it either disregarded or gave short shrift to the arising from or related to prong. And that's why the case ought to be reversed. The only other point I would make on that particular issue is that while the second amended complaint frames the issue, there isn't one mention, not one mention, of the state of Illinois in the claim, in the complaint anywhere. Where was the performance contemplated to take place, performance of the contract? In the months leading up to the release of the picture in the theater. Well, the distribution was to take place all over the country, wasn't it? The distribution? The exhibition would take place throughout the country. Including Illinois. The exhibition by the third party theater owners would be in Illinois. And what responsibility does your claim have, if any, for the acts or omissions of the third party agents or independent contractors, let's call them, if any? None. And I would say, Your Honor, that in fact the third parties here are neither agents nor independent contractors. In the case of theater owners, they are customers. They are at arm's length with MGM Distribution. MGM Distribution's sales force in California contacts third party customers who own theaters. For example, AMC has theaters, as I'm sure you know, in Chicago. AMC is located in Kansas City. So the sales force in California contacts the buyer's representative, the customer representative's, in Kansas City and makes a sale. And the same thing is true on marketing and advertising, that if Madison asks that its media plan be implemented and executed by MGM Distribution, MGM Distribution's responsibilities was to meet with Madison's representatives in California and then to contact third party vendors who are media buy companies, who would then go and buy media and place it. So our position is that it's not either an agent or an independent contractor. It's actually customers and vendors that we were dealing with. But in no way were they agents. And of course, that's an important distinction, as you know, because the acts of independent contractors are not charged to the party in the context of jurisdiction. This district so found in Davis versus Neff in 1973, and that has been the longstanding rule of Illinois. So I then turn to the second prong, the more traditional prong of minimum contacts. For here, the circuit court again erred, because in a couple of ways, actually. First, it disregarded or gave such short shrift to critical elements of the minimum contacts test. Who initiated the transaction? Transaction here was initiated by Paradise. When it put under the original agreement, the so-called put agreement, it put the picture Madison to MGM, and MGM Distribution had no ability to say no unless the film was damaging to its reputation. So the relationship with the film Madison was initiated by plaintiff Paradise. The agreement, there are two agreements. The first agreement between Paradise and MGM Distribution, that isn't what jurisdiction is predicated on in this case. That is a contract between two Delaware companies, both headquartered in California. The agreement was negotiated and formed entirely in California, and it's a nationwide distribution agreement. It is, the jurisdiction in this case is then predicated on the second agreement between- Why are you saying it's not predicated on that first agreement? Because the claim that was made below was only that Madison wanted, came into the picture, so to speak, when the film was put to MGM Distribution, and then wanted that film distributed in 15 states, including Illinois. The first agreement is just an overall six-picture deal by which Paradise had the right to put six pictures of its choosing. No one knew at the time what they would be, two MGM Distribution to distribute. And in fact, there were other pictures, and there were complaints about the way in which MGM distributed those pictures, and there were lawsuits about those, two of those other films, and those lawsuits, not surprisingly, were in California. This one was filed in Illinois, because presumably plaintiffs had some strategic reason for doing so, but the claim was, was that Madison, originally the claim was that Madison was an Illinois company. It turns out after the evidentiary hearing, there was no evidence of that, and quite to the contrary, the operating agreement for Madison establishes that it's not an Illinois party at all. It's a California LLC with its principal place of business in Malibu, California. But the investors in the company reside in Illinois. So we're in this bizarre situation where the plaintiff is asking this court and asks the circuit court, in essence, to disregard its own corporate formalities, to treat it as if it were an Illinois party, because that's where the investors in the California LLC are. I can tell you in my now several decades of law, I've not yet seen where a party has successfully asked a court, other than the circuit court here, to disregard its own corporate formalities in order to gain a litigation advantage. So it's that second agreement where Madison, there's an agreement between Madison and MGM Distribution, which is just a vehicle by which Madison took over the obligations of Paradise in connection with the one film entitled Madison. But Madison is not an Illinois plaintiff. Paradise initiated the second agreement. The second agreement was negotiated entirely in California. In fact, Madison's lawyer in California formed the company as a California LLC for a very specific reason, which was it was easier to obtain financing in the entertainment industry as a California LLC, and then negotiates with MGM Distribution that second agreement entirely in California, and it is formed entirely in California. And on top of it, there is a choice of law provision in the MGM Madison. Madison LLC signed the agreement in Illinois. Signed it in Illinois, returned it to its lawyer in California, who then transmitted it to MGM Distribution, countersigned it in California. And MGM Distribution's in-house lawyer dealt with no one on the negotiation of that agreement other than Madison's California lawyer. Who was in contact with Madison in Illinois. Was in contact with the chairman who is a resident. He's an investor and a resident of the state of Illinois. And that's why I say this is a case where the plaintiff wants the court to disregard its own corporate formalities and treat it where the investors reside rather than where the company is. It's a California company with a California principal place of business according to its own operating agreement and according to what it told the Secretary of State. In fact, Madison is not even registered to do business in Illinois. It just has investors and one officer that happens to reside in Illinois. So all of those factors favor the granting of the motion as does the California choice of law provision, which under the case law, while not dispositive, is evident of the intent of the parties as to what the transaction was all about. And so the circuit court then focuses only on place of performance but errs again because the circuit court finds that performance is where the product ends up. It is in essence a stream of commerce decision that says if you agree to nationwide distribution to try and get the widgets, here the widget is a film, into all 50 jurisdictions or here into 15 jurisdictions at Madison's request, that there must be performance in all of those states. But that's not what the evidence was. The evidence was is that the performance takes place by the sales force acting in California and making its decisions in California. And I emphasize there was not a scintilla of evidence of any physical presence by MGM distribution in this jurisdiction. I think one interesting point to conclude this section of the argument is to contrast this case with the EA Cox v. Road Savers International case. That was a contract was negotiated and formed outside of Illinois. Well, in that case you had an Illinois plaintiff, whereas here you have a California plaintiff. In that case you had physical presence of the defendant in the state of Illinois to deliver the equipment, to test the equipment, to train the employees for the equipment, and to service the equipment. And finally the contract in EA Cox was what I call an Illinois-centric contract. The whole purpose of the contract was to enable the plaintiff to win a bid with the city of Chicago and perform services in Chicago. You have to contrast that here with a nationwide distribution agreement where the distribution activities take place entirely in the state of California. And so when one looks at the quality and nature of the contacts with the various jurisdictions, there was no contact with Illinois, none whatsoever here, other than the widget here in the film made its way into the state of Illinois. And that alone without initiation, negotiation, formation, and a contrary choice of law provision simply cannot support jurisdiction. One last point about EA Cox is that the arising from or relating to Prung was obvious in that case. And the decision really notes that because it was all one and the same. The equipment was delivered to Illinois and the claim arose from the defective equipment in Illinois. Whereas here, as I said, the claimed arising from or relating to, if one looks at the Second Amendment complaint, were decisions made entirely in California, such as whether or not to enable Madison to have the MGM logo and artwork on the film and whether or not to process reorders of the DVDs in a timely way. The last point I'm not going to cover, I think it is well covered in the papers, the fair play and substantial justice. Thank you. My name is Scott Hessel and I represent the plaintiff appellees in this matter, Madison Miracle Productions and Paradise Productions. With me at council table is the chairman, chief executive and really sole decision maker with respect to the distribution decisions and the contract between Madison and MGM distribution and that is Carl Amari. Madison Miracle Productions is not an international or global corporation. It is a corporation that was largely run from start to finish by Mr. Amari out of his offices in Schaumburg, Illinois. The circuit court's finding of personal jurisdiction over the co-defendant, there are actually two defendants in this case as you might have noted in the briefs, both MGM Studios, which is the parent corporation, they're registered to do business in Illinois and regularly do business in Illinois and have not objected to personal jurisdiction in Illinois and their wholly owned subsidiary MGM Distribution, whom if you were to believe Mr. Katz's description of what MGM Distribution does, I'm not clear what it is they do at all. Because if you enter into a contractual relationship with a party who says, we agree to distribute and market your movie in a commercially reasonable manner and in the manner that we distribute one of our own, the necessary corollary of that is not just that they make decisions about distributing and marketing movie, it's that they actually distribute the movie. They actually promote the movie in advance. They actually ensure that our trailers and our posters and the radio and advertising buys occur where we desire them to occur. And here, what the trial court found in making the finding of personal jurisdiction, actually the second judge in this case to make that decision, after listening to four days of live testimony, opening and closing arguments, the review of hundreds of pages of exhibits and deposition designations was that MGM Distribution purposely availed itself of Illinois in its dealings with Madison Miracle Productions. But it was Madison Miracle that went to MGM Distribution, is it not? Well, I gather, Justice Rockford, what you're getting at is who initiated this contractual relationship. And, you know, I think it's a complicated question as to who initiated the deal. As Mr. Katz pointed out, MGM entered into a put agreement voluntarily and willingly that apparently obligated it to distribute movies that were put to it. One of those movies that Paradise put to them was Madison. Now, MGM Distribution was not without its rights under its contract to say, you know what, we don't want to distribute that movie. In fact, the contractual provisions gave sole and exclusive discretion as to MGM Distribution about both whether to accept the film, but also the manner in which it would ultimately be distributed, including specifically the choice of theaters where it would be distributed. With respect to the specific contract between Madison and MGM Distribution, the testimony was that it was MGM Distribution who insisted on that direct contractual relationship between the parties. They said, if the money is going to come from Madison rather than from Paradise, we want a direct contractual relationship with Madison Productions to ensure that they satisfy Paradise's obligations under the put agreement. What then transpired and what the trial court found was that in the six months leading up to the execution of that agreement, the negotiation between the parties, MGM Distribution knew that it was being engaged to disproportionately market and distribute Madison in Illinois. The trial court found and the record established that MGM and Madison jointly agreed to market and distribute the film heavily in the Chicago market, including pre-release marketing and advertising that represented 25% of the total budget for marketing and advertising in this film in Chicago. And MGM Distribution claims they spent that money in Chicago advertising and marketing our film. They also got paid revenues for expending that film, for expending those funds on Madison Productions' behalf in Chicago. When you go to the theater and you pay AMC, or you go to the River East Theater where Madison was shown, or you go to Webster and you pay AMC money for your ticket to watch Madison, AMC in turn sends that money back to MGM Distribution. And MGM Distribution in turn paid us. And that is what we retain them to do. If you were to believe Mr. Katz, we retain them to make decisions and not actually distribute the film. But that is a hyper-technical view of the place of performance, which is directly contrary to what Burger King tells us about a contract analysis in a crucial jurisdiction case. What Burger King says is that the analysis is not mechanical. It is not conceptualistic theories of where did the contract get formed and where was performance rendered as if that occurred only in one state. But Burger King says it doesn't entirely rest on it. It doesn't say these factors are irrelevant. You're 100 percent right, Justice Hoffman. And we are not suggesting that the analysis, the guidance factors that are listed, that are described in Victron about place of execution, initiation, and performance are irrelevant. They are certainly a guide. But at the end of the day, the trial court held an evidentiary hearing, as this court has repeatedly asked trial courts to do, where there is conflicting evidence about a personal jurisdiction challenge. Not only an evidentiary hearing, went on for four days. No one in my firm has ever even heard of a one-day evidentiary hearing, let alone a four-day evidentiary hearing, where the trial court says he considered the minutiae of the transaction, the minutiae of the supposed in place of contracting, and he weighed all that evidence and came to the conclusion that MGM Distribution knew and understood, prior to contracting with Madison, that it was entering into a long-term and ongoing commercial relationship with a party who is substantially connected to Illinois. Not only did he find that, but there's a substantial connection to Illinois. So, you read my mind, because the next, the record evidence showed that all of the decisions related to the agreement between these two parties, including the decision to execute the agreement, the decision where to distribute the movie, how to distribute the movie, those decisions were made by Madison, by Mr. Amari, and Sean Berger and I. How do we know that Madison knew that? I mean, that MGM Distribution knew that? Look at the contract. The contract, on its face, provides that all essential communications and notices to Madison Miracle Productions were to be made to Mr. Amari and Sean Berger and I. But they were looking at, during this negotiation, at Madison's California lawyer, and the discussions were with a lawyer in California. What the record evidence showed was that the agreement had been reached in the six months prior to the actual documenting. So, the sequence here, the timeline is that in November of 2003, Paradise puts the movie to MGM Distribution. For the next six months, Mr. Hester for MGM Distribution, and Mr. Amari had back and forth discussions about what that relationship would look like. Ultimately, the documenting, the paper documenting of the transaction was done by Madison's lawyer, who they hired because they believed him to be a specialist in dealing with movie studios. So, the concert was actually entered into in California? The execution by Madison was in Illinois. They knew that. The execution by MGM was in California. There was no record evidence offered by MGM about who was actually the last one to sign the agreement. So, from our perspective, they knew that the party with whom they were entering into a 12-year business relationship was executing the agreement in Illinois. Madison LLC was the person that they were entering into a contract with. Right, which the trial court found, after weighing all the evidence, was a party that they knew was substantially connected to Illinois. How is it substantially connected to Illinois when it's not registered to do business here? It's a California LLC, and that is an entity separate and apart from Mr. Amari. No question about everything you just said. The question is, does the fact that a business that is headquartered in Illinois and then happens to be incorporated in another state, does that make it a business that is in that other state? And how do you say that it's headquartered in? Every decision with respect to this contract and the relationship, the 12-year relationship between the parties, was with Mr. Amari in Schomburg. There was no record evidence that there was dealings between Madison and MGM other than the interfacing with the lawyer prior to execution of the agreement in California. There was no office. Mr. Amari never went to California to run this business. He ran the business entirely from Schomburg, Illinois, which is why they insisted that all essential communications and notices be sent to him in Illinois. The record after the point of contract, the actual course of dealings between these parties, another factor that Burger King emphasizes, all of those back and forth communications, those were with Madison or with Madison's representatives, but ultimately MGM knew that the person who made the decisions for Madison was Mr. Amari. Who transmitted the contract from California to Mr. Amari for signature? Mr. Taylor. Mr. Taylor. And the question, I think, as you struggle with the record here, is that MGM distribution made all of these arguments to the trial court. That's what we did over the four-day evidentiary hearing. We went back and forth over where was the contract negotiated, where was the contract executed, where was the performance contemplated. And what he found when weighing all of that evidence, which is exactly what this court directs trial courts to do in, for example, Rupert, where it is not the function of this court to weigh the evidence, but that of the trial court. In weighing that evidence, this court, the court below, found that the most compelling evidence was the evidence that they contemplated substantial performance in Illinois. And there were two respects to his decision. One, they knew before they entered into the contractual relationship with Madison that Illinois would be disproportionately targeted. And in fact, that actually happened. And two, they knew that the decision maker and the person with whom they were going to be dealing on a go-and-for basis was office here. The company was officed here. Tax forms that were submitted by the company identified the Schomburg address. The back-and-forth communications, when MGM Distribution wanted to reach out and enter into several amendments and additional agreements between the parties after 2004. In one of those agreements, a nondisclosure agreement, MGM actually signed an agreement that recited that our principal place of business, Madison's principal place of business, was the same address in Schomburg, Illinois. And thereafter, there was evidence, substantial record evidence, that the back-and-forth were between MGM in California and Madison in Illinois. Does the mere fact that they hired a California lawyer when they were in the movie business who specialized in dealing with movie studios and labor associated with movies mean that the negotiations and the execution somehow are taken from where the party actually is and transposed to where the lawyer they hired is? Does the fact that the lawyer used his former California LLC agreements make any difference to whether or not MGM Distribution knew that the party with whom they were dealing was actually Illinois-based? And we still need to look at what were the defendant's actions in the state. And the defendant was dealing with people, California people in California. Only with respect to the negotiation of the agreement. After the agreement was entered and what the trial court found was that they knew, MGM Distribution knew, that its performance and the origin of the relationship on a going-forward basis was going to be with the chairman and chief executive of the company in Illinois. And that's what the correspondence actually reflected. And that's why the trial court found that to be the dispositive factor. I point out that there are literally dozens of cases from this court that identify companies as Illinois businesses, even though they were incorporated in other states. They have a dual business here, they have offices here, they have a registered agency. We're not concerned about what this company did, we're concerned about them. The cases that I'm referring to and the two examples that I'll give you are Capital Associates. In Capital Associates, which is a First District 1985 case, California Home Builder is the defendant in the case. Never left California. The performance that was contemplated was building a building in California. The fact that they voluntarily entered into a business relationship with an Illinois resident was the dispositive fact. What's interesting about Capital Associates is that that entity... Well, hold on a second. But your client isn't an Illinois resident. It's a California corporation. You merge their principles with the separate entity of the corporation. The LLC is a California LLC. In Capital Associates, the plaintiff was a Delaware GP of a California LP. The reason why we look to things beyond just the place of incorporation, the reason why there was substantial evidence at trial put forth... In that case, was the party registered to do business in Illinois? It wasn't at issue. But I don't... I guess... It was not. It's true. They were not. And it's an issue that apparently was an oversight prior to the litigation, which they are rectifying. But it is not relevant to whether or not they knew that the party with whom they were actually dealing was based here. And that is what the trial court found. So what is the manifest evidence to the contrary? He heard from Mr. Hester, who testified that he knew the company was based here. He knew the investors were all here. You don't disregard the fact that the company wasn't incorporated here, but you need to look beyond the place of incorporation to determine where a company is headquartered. Otherwise, probably most of the corporations in this state are not Illinois businesses. They are apparently the businesses of some other state. But when you deal with Walgreens, even though they might be a Delaware corporation, you know when all of the decisions are being made there, and the people that you're dealing with are there, and the place for notice or essential communications, and the contract that you enter into with them is here, that you're really dealing with an Illinois company. In fact, there was no evidence at trial that Mr. Hester was even aware where the place of incorporation was of the company at the time of contracting. Why would he be? Especially when the contract on its face said Illinois. That's the address of the company that's listed in the agreement they signed. They further signed another agreement six months later that's acknowledged that the principal place of business was here. In conclusion, this trial court did exactly as this court has repeatedly directed trial jurisdiction, unlike choice of law, unlike venue, is not a contest between two states where the winning state is the only place the claim can be brought. It is an analysis that looks at the entire course of dealings between the parties. And this trial court, after considering all of the arguments they're making now, found that personal jurisdiction was appropriate in Illinois. And we ask that that decision be affirmed and that we be allowed to move forward with the merits of the claims against both defendants. Thank you, counsel. Thank you. Thank you, your honor. I'm going to address only two brief points. First, I thought one of the most telling things about counsel's argument was in response to the question, what are the substantial connections between MGM distribution in Illinois? And the response that you heard was that plaintiff's decisions were made in Illinois by Mr. Amar. And every case in the due process area consistently says that it is not the plaintiff's contacts with the jurisdiction, it is the defendant's contacts with the jurisdictions. And in that regard, I simply want to reiterate the evidence, even about the plaintiff, not only were they not registered to transact business in Illinois, they had four offices in California, their post-production facilities were in California, their marketing representatives were in California, and their president, who was also the director of the film, was in California, and those were the folks who my client interfaced with on a regular basis. But it occurs to me that he makes the point that your client knew that there would be a disproportionate distribution into the state of Illinois, and then makes almost an aside purposeful availment argument, that you purposefully availed yourself of the right to do business in the state of Illinois, and hinges jurisdiction on that, and it appears from the quote of the trial court that that's what the trial court felt, that there was a purposeful availment. So first of all, the supposed disproportionate distribution in Illinois, really it's a bit of a misnomer, because this was what was known as a limited release, or a platform release. If successful, if the film played well, it would have been distributed all throughout the country, and it wouldn't have been disproportionate at all. Secondly, the initial platform release that was weighted more heavily for the Midwest and Illinois was decided after the contract was entered into. That was not the intended performance under either the put agreement or the second agreement. That marketing plan came one or two months after the second agreement was entered into. Third, that was Madison's decision on how to market it. MGM, and counsel asked the question rhetorically, what does MGM do, other than make decisions? Well, we have a sales force, and we have customers around the country. The sales force is in California, and it sells to customers around the country to try and get them to buy the product, to exhibit it where Madison wanted it exhibited. The fact that it was Madison's decision to distribute in Illinois, is that really relevant, or is the question whether once Madison has directed that it be done in Illinois, you're doing it in Illinois, and you're doing it there disproportionately. I mean, you know, I'm kind of a simple guy. If I hire somebody in California to build me a house, I make the decision that the house is going to be built in Illinois, don't I? They don't. So if they breach the contract, I get to sue them in Illinois, because this is where the performance would be. But I made the decision they didn't, but they're still the defendants. There might be something to that, Your Honor, if we were the theater owner and the exhibitor. But that's not what we do. That's not our business. Our distribution business is to tap into our network of customers around the country to try and get them to buy the product, to get it into the stream of commerce in the various jurisdictions. And here, it certainly included, and according to Madison, disproportionately at their request, was to be distributed in Illinois. But what we were doing, in addition to making decisions, and I keep focusing on the making of decisions because of the arising from or related to Prong and what their claim is about. Their claim is not about the film getting into Illinois theaters. It's about the decisions that were made about the logo and the artwork, all that took place in California. But even if we focus on the minimum contact Prong, we're a sales company. We sell widgets and we sell them from California. And if we have a customer that comes to us and says, okay, we're entering into an agreement. We want you to sell a lot of widgets in 15 different states, because there were 15 different states in the initial release. And one of them is Illinois. And we want it more heavily sold in Illinois in the first instance to see if it's successful. Well, we're still not physically entering Illinois. We're not doing anything. Isn't the argument better put, did you avail yourself of the Illinois market, or did they avail themselves of the Illinois market? If you're going to rest this on a purposeful availment theory. Well, certainly they were the ones that were trying to purposely avail themselves of Illinois. And remember that the test under the law is purposeful availment of the privileges of conducting activities in the forum, thus invoking the benefits and protections of the law. Now, it cannot be said when phrased that way, and that's the test for due process, that that was what MGM distribution was doing. That's an Asahi argument. Asahi is a plurality distribution. It's a, I'm sorry? But Asahi is the U.S. Supreme Court case that gave us that test initially. Yes. And it's a plurality distribution. It's not a majority distribution. It is, indeed. But I think it is fair to say that there is a consistent body of case law, including in Illinois, that putting things in the stream of commerce and getting your widgets in various jurisdictions is not performance in that jurisdiction and does not give rise to jurisdiction in a breach of contract case. And that's what we have here. Okay. Thank you. Thank you. Ladies and gentlemen, the meeting will be taken under advisement, and we'll release our opinion in due course.